UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 05-10035 PBS |
| | ) | |
| MARYSOL MORALES | ) | |
| | ) | |

## UNITED STATES' TRIAL MEMORANDUM

The United States of America, by its undersigned counsel, submits this memorandum in

order to advise the Court and defense counsel regarding anticipated evidence at trail.

## OFFENSES CHARGED

The Superseding Indictment in this case charges Marysol Morales with Six counts of

corrupt receipt of payments by agent of federally funded entity, in violation of 18 U.S.C. § 666,

and with 15 counts of making or using false documents in a matter within jurisdiction of federal

agency, in violation of 18 U.S.C. §1001.

As described in the Indictment, prior to her dismissal in January 2005, Morales was the

Section 8 Housing Manager for the Avon Housing Authority.  In that capacity she was

responsible for administering the Section 8 rent subsidy program operated by the Avon Housing

Authority.  That federally-funded program is supposed to provide rent subsidy vouchers to needy

families, which can be used to subsidize monthly rent payments for ordinary apartments (i.e.,

apartments outside public housing projects).  Due to the limited amount of funding available for

the Section 8 housing program, Avon Housing Authority, like other public housing authorities in

Massachusetts, had no funding available to provide vouchers to new clients.

Even though there was no federal money available to add new clients to the rent subsidy

program, in the spring and summer of 2004 Morales issued dozens of vouchers which the

recipients used to obtain housing, at the expense of the Avon Housing Authority. By the time Morales's fraud was discovered in November 2004, approximately 80-90 such unfunded, unauthorized "vouchers" had been issued. As a result, Avon Housing Authority paid out hundreds of thousands of dollars in rent subsidies for which there was no federal funding available – virtually bankrupting the housing authority.

While the housing authority was hemorrhaging money due to the unauthorized vouchers, Morales covered up the problem by forging bogus vouchers from the <u>Boston</u> Housing Authority and placing them in the tenant files maintained by the Avon Housing Authority. Because vouchers are "portable," the presence of the bogus <u>Boston</u> vouchers indicated that <u>Boston</u> (not Avon) bore financial responsibility for the listed tenants. It was not unusual to encounter delays in the processing of payments between different housing authorities and so, for several months, Morales's ruse forestalled the discovery of her fraud. The Executive Director of the Avon Housing Authority vainly dunned the Boston Housing Authority for payment of an ever-growing "receivable," while Morales continued to issue new vouchers to would-be tenants.

Counts Seven through Twenty-one of the Indictment arise from 15 of the instances in which Morales created phony Boston Housing Authority vouchers. The forged Boston vouchers on are a standard HUD form, which Morales apparently altered on the word-processor (with a few errors). They represent a portion of the large "receivable" shown on the Avon Housing Authority's financial statement for the fiscal year ending on June 31, 2004. That financial statement was submitted directly to HUD in September 2004.

As described in Counts One through Six, in the fall of 2004 Morales took money from at least six women who were seeking housing assistance. The women, who were seeking rent

subsidy vouchers for themselves and their young children paid Morales cash in amounts ranging

from $2,600 to $6,000.  Some of these women were led to believe that their cash payments were

for a legitimate purpose: to serve as "first and last month's rent, plus a security deposit" for their

rental apartments.  Others understood they were paying bribes.

Before any of the six women obtained housing, Morales's fraud was uncovered and they

were left with nothing – their money gone, no voucher, no apartment.  Meanwhile, many of

those who had actually received unfunded vouchers from Morales were no better off.  When the

fraud was uncovered, all of payments on unfunded vouchers were discontinued, stranding dozens

of families.  Just after Christmas dozens of families, and their landlords, were informed that their

rent subsidies would be discontinued immediately.

ELEMENTS OF THE OFFENSES

A.    Soliciting Payments by Agent of Program Receiving Federal Funds

1.    The Statute

Title 18, United States Code, Section 666, provides in pertinent part:

 (a) Whoever, if the circumstance described in subsection (b) of this section
exists--

(1) being an agent of an organization, or of a State, local, or Indian tribal
government, or any agency thereof--

* * *

(B) corruptly solicits or demands for the benefit of any person, or accepts or
agrees to accept, anything of value from any person, intending to be influenced or
rewarded in connection with any business, transaction, or series of transactions of
such organization, government, or agency involving any thing of value of $5,000
or more;

* * *

shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in subsection (a) of this section is that the
organization, government, or agency receives, in any one year period, benefits in

-3-

excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

    2.    <u>Elements</u>

With respect to the soliciting/receiving prong of the statute (Section 666(a)(1)), the

elements of the offense are as follows:

        1.    The defendant, was an agent of an organization, local government, or agency of a local government;

        2.    The defendant corruptly solicited, demanded or accepted, something of value, namely money, intending to be influenced or rewarded in connection with business, transactions, or a series of transactions of such organization, local government, or agency;

        3.    The business, transaction, or series of transactions involved a thing of value of $5,000 or more;

        4.    The organization, local government, or agency of a local government; received benefits from the federal government in excess of $10,000 in a twelve month period covering the time of the offense.[1]

<u>See</u> Judicial Committee on Model Jury Instructions For the Eighth Circuit, <u>Manual of Model</u>

<u>Criminal Jury Instructions for the District Courts of the Eighth Circuit</u>, §6.00 Final Instructions:

Elements of Offenses (6.18.666B Solicitation Or Acceptance Of A Bribe By An Agent Of A

Program Receiving Federal Funds (18 U.S.C. § 666(a)(1)(B))).

---

    [1]    The one-year period defined by the statute includes any continuous 12-month period that includes the date of offense.  18 U.S.C. § 666(d)(5).  The Indictment, however, describes a narrower period (<u>i.e.</u> a specific calendar year).

B.    USE OF FALSE DOCUMENTS WITHIN THE JURISDICTION OF A
      FEDERAL AGENCY

1.    The Statute

While the "False Statements" statute, 18 U.S.C. § 1001, is familiar.  In this case,

however, the Indictment charges a violation of a lesser-known offense in that statute, which

criminalizes the use of false writings or documents.

Title 18, United States Code, Section 1001, provides in pertinent part:

> (a)  . . . whoever, in any matter within the jurisdiction of the executive . . . branch
> of the Government of the United States, knowingly and willfully--
>                          * * *
>      (3) makes or uses any false writing or document knowing the same to
>      contain any materially false, fictitious, or fraudulent statement or entry;

shall be [guilty of an offense].

2.    Elements

According to the First Circuit, there are "five prerequisites to a violation of Section 1001:

(1) a statement that was (2) false, (3) material, (4) made knowingly and willfully, and (5) made

in a matter within the jurisdiction of a federal agency."  United States v. Notarantonio, 758 F.2d

777, 785 (1st Cir.1985).  Adapting those elements to the "false writing or document" offense

yields the following elements:

1.    The defendant, made or used the writings or documents;

2.    which contained statements or entries that were false, fictitious or fraudulent;

3.    material;

4.    made or used knowingly and willfully; and

5.    made or used in a matter within the jurisdiction of a federal agency.

ANTICIPATED EVIDENCE

TESTIMONY

The United States anticipates calling some or all of the following witnesses:

Avon Housing Authority Officials and Accountants

Krisanne Sheedy, Executive Director of the Avon Housing Authority, and Margaret

Josephine Holmes, former Section 8 manager and Board Member, Avon Housing Authority, are

expected to testify about their dealings with Marysol Morales over a number of years.

Sheedy will describe the operation of the Section 8 rent subsidy program.  Sheedy will

describe Morales' duties as manager of the Section 8 rent subsidy voucher program.  She will

also describe her dealings with Marysol Morales during the summer and fall of 2004, as she

attempted to learn the source of the steadily worsening cash flow problem facing the Avon

Housing Authority.   Sheedy will identify documents found in the Section 8 program files,

including 15 of the files that contained putative Boston vouchers and five informal files

containing preliminary "qualifying" information for women who paid Morales for vouchers

during the fall of 2004.

Margaret Josephine Holmes will describe in detail the record-keeping practices of the

Avon Housing Authority Section 8 rent subsidy voucher program and her training of Marysol

Morales.  She will also describe her conversation with Morales in the fall of 2004 regarding the

purported shortfall due to the putative "arrears" of the Boston Housing Authority.

Jack Sullivan, CPA, and his assistants, Jane Isnor and Angela Qiu will identify

spreadsheets that Morales sent to them purporting to show monies owed to the Avon Housing

Authority by the Boston Housing Authority.  They will also describe their interactions with

Morales during the monthly bookkeeping/accounting cycle and their preparation of financial reports for the Avon Housing Authority.

<u>Boston Housing Authority Officials</u>

Madeline Gatti, Special Projects Director, Boston Housing Authority, will describe her dealings with representatives of the Avon Housing Authority, including Marysol Morales, during the fall of 2004. She will describe her face-to-face and telephone contacts with Morales and others from the Avon Housing Authority and will identify fax and e-mail correspondence that she received from the Avon Housing Authority.

Marilyn O'Sullivan, Chief Officer for Leased Housing and Occupancy, Boston Housing Authority, will describe the status of the Boston Housing Authority rent subsidy voucher program as of 2004, and will testify regarding her review of Boston Housing Authority records. With respect to the Boston vouchers that were found in the Section 8 program files of the Avon Housing Authority, O'Sullivan will describe her efforts to identify the named recipients in the BHA files.

<u>Individuals Seeking Housing Assistance</u>

Six women, Janet Montissol, Belkis Ortiz, Vilma Nunez, Alenairam Mejia, Eleanor Paris, and Airin Gonzalez are expected to testify regarding their dealings with Marysol Morales. (These women are identified in the Indictment by their initials.) Each of these women is expected to testify that she paid cash to Marysol Morales, on the understanding that she would receive a rent subsidy voucher for an apartment of 2 bedrooms or more.

EXHIBITS

The United States will offer documentary evidence, which falls into the following rough

categories:

| Exhibit Numbers | Type of Documents |
| --- | --- |
| 1-3 | Photos of the Avon Housing Authority Office |
| 4-8 | Records reflecting the training and qualifications of Marysol Morales |
| 9 | Bank Statements of the Avon Housing Authority |
| 10-11 | Program Information regarding Section 8 rent subsidy vouchers from the desk of Marysol Morales |
| 12-16 | Notes and correspondence pertaining to the calculation of payments "owed" to Avon Housing Authority from Boston Housing Authority |
| 17 | Marysol Morales's Desk Calendar 2004 |
| 18 | Avon Housing Authority Subsidy Termination Letters |
| 20-22 | Accounting Records:  Avon Housing Authority |
| 23-37 | Section 8 Program Files of Avon Housing Authority (files containing the putative BHA vouchers described in Counts 7-21) |
| 38-42 | Miscellaneous Files found in the Avon Housing Authority Section 8 Program Files (files pertaining to individuals who paid cash for vouchers) |
| 43-56 | Boston Housing Authority records (including correspondence with Avon Housing Authority) |

-8-

<u>EVIDENTIARY ISSUES</u>

The Court has instructed the parties for briefings regarding the application of Rule 404(b) to the United States's proposed evidence showing Morales's perpetration of the overall fraud scheme, of which the identified folders (Exhibits 23-42) were a part.

While the Indictment charges only 15 violations of 18 U.S.C. § 1001, the files in question represent a sampling of the many files in which Morales issued unfunded, unauthorized vouchers. These fifteen files were among many that were identified after Marysol Morales suddenly stopped working at the Avon Housing Authority. As noted above, prior to her departure Morales lied repeatedly in attributing the rising tide of red ink at the Avon Housing Authority to an unpaid "receivable" from the BHA. Those lies, which relate to the deficit as a whole, rather than to any specific file, were part and parcel of the criminal conduct at issue.

By its terms, Rule 404(b) excludes extrinsic evidence i.e, "evidence of *other* crimes, wrongs, or acts" where the probative value of the evidence is limited to the inference of "criminal propensity." <u>See</u> <u>United States v. Trenkler</u>, 61 F.3d 45, 56 (1st Cir. 1995). By contrast, circumstantial evidence "intrinsic" to the crime for which the defendant is on trial is not governed by Rule 404(b). <u>See</u> <u>United States v. Tutiven</u>, 40 F.3d 1, 5-6 (1st Cir. 1994). In <u>United States v. Tutiven</u>, a prosecution for possession of motor vehicles with altered identification numbers, the Court of Appeals concluded that evidence that the defendant possessed tools for altering vehicle identification numbers was admissible, without need for analysis under Rule 404(b). The Court noted:

> The cases are legion in which similar intrinsic circumstantial evidence has been admitted without occasioning either challenge or analysis under Rule 404(b). *See, e.g., United States v. Ford,* 22 F.3d 374, 381 (1st Cir.1994) (upholding admission of evidence that defendant in drug case possessed instructional

materials on methamphetamine manufacture); *United States v. Nason,* 9 F.3d 155, 162 (1st Cir.1993) (upholding admission of scales, bags, and baggies seized from motel room registered to defendant's girlfriend at time of defendant's arrest on the marijuana charges for which he was on trial); *United States v. Cresta,* 825 F.2d 538, 554 (1st Cir.1987) (upholding admission of weapons possessed by defendant during the drug smuggling crime for which he was on trial).

Tutiven, 40 F.3d at 5.

In this case, the evidence of the growing "receivable" on Avon Housing Authority's books is an essential component of the criminal scheme that Morales perpetrated.  Indeed, the individual false statements that are charged in the Indictment can only be understood as part of the overall course of Morales's criminal plan.  This is not a case in which the prosecution seeks to introduce "evidence of *other* crimes, wrongs, or acts."  Rather, the prosecution seeks only to show how the defendant committed the crimes with which she is charged.  This entails presenting evidence of the defendant's course of criminal conduct.  That course of conduct involved concealing the true origins of a large spending deficit at the Avon Housing Authority.  Rather than burden the Court with an 80 or 90 count indictment – listing all files with forged and falsified documents – the prosecution has chosen a sample of 15 instances of the kind of false documentation that underlay the scheme.

Even assuming Rule 404(b) applied to the evidence of the criminal scheme of which the 15 files are a part, evidence of the scheme as a whole is properly admissible to show Morales's "intent, preparation, plan, knowledge and identity and the absence of any mistake or accident." Fed. R. Evid. 404(b).  Rule 404(b) provides that evidence of a defendant's other bad acts may not be admitted to prove her criminal character or propensity to commit crimes of the sort for which she is on trial.  To admit evidence of other bad acts, a trial court must find that the evidence passes two tests.  First, the evidence must have "special relevance" to an issue in the

case such as intent or knowledge, and must not include bad character or propensity as a necessary link in the inferential chain.  Second, under Rule 403, evidence that is specially relevant may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.  See United States v. Varoudakis, 233 F.3d 113, 118 (1st Cir. 2000).

Rule 404(b) evidence is deemed to have special relevance if the evidence permits an inference, not based on character, probative of a material issue.  See United States v. Nickens, 955 F.2d 112, 124, 125 (1st Cir. 1992) ("As knowledge and intent were plainly at issue, the question becomes whether or not the evidence of the prior conviction would allow a juror to make at least one inference probative of Nickens' knowledge and intent that does not include his character as a necessary link.").

In Nickens, the Court of Appeals affirmed the admission of a defendant's prior narcotics convictions, concluding that a reasonable jury could have inferred that the defendant's prior experience selling cocaine made it more likely that he knew how drug traffickers operate, and therefore less likely that he had been duped by two friendly young men who, according to the defendant, had planted drugs in his suitcase.  Id.  See also United States v. Moccia, 681 F.2d 61, 63 (1st Cir. 1982) (jury could "infer that one who lives on a farm with marijuana in the freezer room and under the chicken coop and has a prior possession conviction is more likely to know about the presence of marijuana than one who lives on such a farm and does not have a past possession conviction").

In this case, Morales's misrepresentations about the nature and source of the deficit in the Section 8 rent subsidy program link her to the falsehoods in the files and show that she was operating, not by accident, but according to a criminal plan.  That Morales compounded the false

statements in the files with oral misrepresentations on precisely the same subject, while her criminal scheme was underway, is pertinent to show: (1) identity (that it was <u>Morales</u>'s scheme, not someone else's); (2) intent (that Morales's purpose was to mislead and to conceal her pattern of issuing unauthorized vouchers); (3) preparation and plan (that the false documents in the files were part of an overall scheme or plan, not mere happenstance); (4) knowledge (that Morales knew of the falsehoods in the documents she put into the Avon Housing Authority files); and absence of any mistake or accident (that Morales did not simply mis-type or misunderstand the nature and purpose of the falsified documents).  None of these inferences depends in any way on any reference to "character" or "propensity."  The evidence carries no implication that Morales is a bad person because she behaved badly on some other occasion.  Rather, the evidence is that – on the occasion charged in the indictment – Morales executed a criminal plan and scheme of which the individual counts were part.

Under Rule 403, the Court must also consider – for all evidence, not just evidence offered under Rule 404(b) –  whether the probative value of proffered evidence is "substantially outweighed by the danger of unfair prejudice."  Fed. R. Evid. 403.  In this case, there is no unfair prejudice whatsoever.  The conduct at issue is not inherently inflammatory and its probative weight goes directly to describing the immediate circumstances of the charged crime.  The evidence tends to show that Morales is guilty of the charges in the Indictment, but does nothing to inflame a jury or to disparage her character generally.  <u>See Varoudakis</u>, 233 F.3d at 122 ("Usually, courts use the term 'unfair prejudice' for evidence that invites the jury to render a verdict on an improper emotional basis.").

-12-

A First Circuit case analogous to the matter at bar is <u>United States v. Oppon</u>, 863 F.2d 141 (1st Cir. 1988). In that case, a defendant who was charged with falsely claiming to be a U.S. citizen and with assisting others in obtaining employment on the basis of similar false representations. The trial court admitted evidence of numerous instances – not charged in the indictment – in which the defendant had prepared or submitted employment applications, for himself and others with false citizenship information. 863 F.2d at 144-46. In affirming the district court's admission of this evidence the Court of Appeals noted:

> The other acts herein concerned are strikingly similar to the charged offense, <u>i.e.</u>, they all involve employment-related forms requiring citizenship information. This is not a case where "the probative worth [of the prior acts evidence] toward proving [the defendant's] intent to commit the [charged] offense is difficult to conceptualize. *United States v. Lynn,* 856 F.2d 430, 436 (1st Cir.1988). It is not unfair to infer from the evidence presented that appellant had developed a common scheme or plan of falsely identifying himself as a U.S. Citizen in order to obtain employment and employment-related benefits, and that it was he who completed the citizenship information in the form 500A. It is also important that the appellant's other acts occurred within a year of the charged offense. This also contrasts with the admission of evidence of a prior act that had taken place six years before the charged offense, which in *Lynn* we found to attenuate any possible legitimate probative value that such evidence might have had. *Lynn,* 856 F.2d at 436.

<u>Oppon</u>, 863 F.2d at 147-48.

In this case, the "similarity" between the "other acts" and the charged offense is in some respects closer than in <u>Oppon</u>, which involved evidence of false statements that were submitted to a variety of different entities. Moreover, the United States does not anticipate offering evidence of the multiple additional instances in which Morales prepared forged vouchers and other false documentation. Rather, the United States will simply show the unfolding of

Morales's criminal scheme, of which the charged false statements were a part.[2]  But in any event, the inferences to be drawn are of the same ilk as in <u>Oppon</u>: that the defendant prepetrated a single fraud scheme, within a limited time frame, which involved repeated instances of the same kind of fraudulent conduct.

While the defendant has not suggested what line of defense she may pursue in this case, each of the charges requires proof of knowledge and intent.  <u>See generally</u>  <u>Varoudakis</u>, 233 F.3d at 121(citing <u>Oppon</u> for the proposition that "such evidence may be admitted to show knowledge or intent when the defense is a general denial of the charges").  The anticipated evidence is aimed at satisfying the government's burden of proof as to both knowledge and intent.

In sum, to the extent that this issue is governed by Rule 404(b), the special relevance of the United States' proposed evidence is not "character based" and far outweighs any arguable unfair prejudice.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

dated:  April 12, 2006

By: <u>*/s/ Paul G. Levenson*</u>
PAUL G. LEVENSON
Assistant U.S. Attorney
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3147

---

[2]        Indeed, as noted above, the United States's position is that these are not "other acts" at all, but part of the same course of conduct.

<u>CERTIFICATE OF SERVICE</u>

 I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non registered participants on this date.

dated:  April 12, 2006

    /s/ Paul G. Levenson_____
    PAUL G. LEVENSON