UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | Criminal No. 05-10035 PBS |
| MARYSOL MORALES | ) ) ) | |

UNITED STATES' SENTENCING MEMORANDUM

I.   REQUIRED NOTICES

As required by Paragraph 10(a)(1) of the Court's Scheduling Order, the United States hereby informs the Court as follows:

(a)   Notice of Motion for Departures or Non-Guideline Sentence

For the reasons detailed below, in the event that the Court does not adopt the guideline calculation set forth in the Presentence Report (PSR), the United States will ask the Court to depart upward or to impose a non-guidelines sentence to the extent necessary to impose a sentence at the top of the guideline range identified in the PSR.

(b)   Legal Questions Not Addressed in PSR

As noted below, there is additional authority, cited below, in support of the guideline calculation set forth in the PSR. In addition, to the extent that a departure or non-guidelines sentence may be appropriate, the legal basis for imposing such a sentence is addressed below.

(c) <u>No Need for Evidentiary Hearing</u>

Based upon the review of defendant's objections to the PSR, and taking into account the Court's opportunity to consider the pertinent evidence during the trial of this case, the United States does not anticipate that any evidentiary hearing will be required. The United States notes, however, that the Court will need to make factual findings with respect to the applicability of the "Obstruction of Justice/perjury" enhancement. In addition, the United States informs the Court that at least one individual, Krisanne Sheedy, Director, Avon Housing Authority, will exercise her right to address the Court as a victim of Morales's offenses.

II.     <u>GUIDELINE ISSUES</u>

1.     <u>Value Calculation</u>

In her objections to the PSR, Morales contests the use of the value of the anticipated housing subsidies – rather than the amount of the bribes – in calculating the enhancement for bribe value under U.S.S.G. §2C1.1(b)(2). But common sense suggests that – when a monetary benefit is involved – capping a defendant's responsibility based upon the bare amount of the bribe will almost always <u>undercount</u> the defendant's culpability. Simply put, no one would have paid $5,000 in bribes unless they anticipated receiving housing subsidies of far greater value. The Eight Circuit's decision in <u>United States v. Hang</u>, 75 F.3d 1275, 1284 (8th Cir. 1996), is directly on point. In that case, a housing eligibility technician had taken relatively small bribes as a condition of processing Section 8 subsidy applications. The defendant argued, as Morales does now, that only the value of the bribes, not the value of the subsidies, should be weighed.

The court of appeals rejected that argument, affirming the district court's use of an estimate based upon the value of the anticipated subsidies for one year.

In this case, the valuation of Morales's crimes is very conservative. Not only is a low monthly figure used, but only one-year's worth of subsidies is accounted for – even though most recipients get Section 8 benefits for many years. The district court in Hang followed much the same approach, prompting the following comment from the Court of Appeals:

> [I]t appears that the district court's methodology was charitable to Hang. For instance, though the court used one year as the baseline figure for determining the total value received, in this case each of the victims actually resided in federally subsidized housing for longer periods of time.

75 F.3d 1284.

    2.  Vulnerable Victim Enhancement

In her objections to the PSR, Morales suggests that there should be no "vulnerable victim" enhancement because "the vulnerability of these victims was part of the crime itself." In this case, the evidence overwhelmingly showed that those most immediately victimized by Morales's criminal scheme were young women who were poor single-mothers, several of whom spoke little or no English, all desperate for decent housing. By any definition, these victims were "vulnerable."

Morales is correct that, as a general rule "susceptibility to the defendant's scheme *alone* is not enough to qualify victims as unusually vulnerable" United States v. Garza, 429 F.3d 165, 173-174 (5th Cir. 2005) (emphasis in orginal). The mere fact that someone has been victimized by a crime does not, in itself, mean they are "vulnerable" members of our community; for instances, wealthy but gullible (or greedy) investors in a Ponzi scheme are not deemed "vulnerable." Rather, the "vulnerable victim" enhancement is intended to, and does, recognize

the <u>additional</u> culpability of those whose criminal schemes are knowingly designed to take advantage of the most vulnerable members of our society. The guideline is designed to add incremental punishment for those who, like Morales, steal from the poor and the desperate.

Morales's assertion that "the vulnerability of these victims was part of the crime itself," misses the point. It is true that, in some instances, a particular offense or guideline may include – as a required element – proof of circumstances that might otherwise warrant an enhancement under the guidelines. In such cases, no additional enhancement is warranted.[1] Thus, when a defendant is charged with smuggling illegal aliens, it is inappropriate to apply the vulnerable victim enhancement merely because illegal aliens tend to be particularly vulnerable in our society. <u>See</u> <u>Garza</u>, 429 F.3d at 173 (citing <u>United States v. Angeles-Mendoza</u>, 407 F.3d 742, 748 (5th Cir. 2005)). By contrast, when a defendant executes a fraud scheme that targets vulnerable illegal aliens, their vulnerability is not accounted for in the basic guideline and warrants a "vulnerable victim enhancement." <u>Id.</u> To put it another way, there is no way to smuggle illegal aliens without involving illegal aliens but there are lots of ways to commit fraud, and the guidelines recognize that schemes which target illegal aliens or other vulnerable victims are especially reprehensible.

In this case the offense of conviction – illegal receipt of money in connection with agency receiving federal funds – does <u>not</u> inherently involve the heartless exploitation of the

---

[1] For example, in calculating Morales's guidelines for Group #1 (the "bribery counts"), there is no enhancement based on the that Morales was a public official who breached her position of trust. That factor is effectively built-into the guideline. <u>See</u> U.S.S.G. §2C1.1, comment. n.6 (inapplicability of "abuse of position of trust" enhancement). By contrast, for Group #2 (the false document charges), there <u>is</u> an "abuse of position of trust" enhancement since the basic offense – using false documents in a matter within federal jurisdiction – can be committed by civilians and public officials alike.

poor and vulnerable. A housing agency official such as Ms. Morales could, for example, have violated this statute by demanding kickbacks from landlords or from contractors who built or maintained public housing. Such conduct would fully satisfy the statutory elements, and would otherwise be governed by the same guidelines, but it would not involve targeting the poor and desperate.

The two-level enhancement is appropriate because Morales's greedy scheme knowingly and intentionally targeted the poor, the ignorant and the desperate.

### 3. Perjury Enhancement

As the First Circuit has noted, "[i]t is settled that a finding of perjury can serve as the basis for the enhancement" of a defendant's sentence for obstruction of justice under U.S.S.G. §3C1.1. United States v. Fox, 393 F.3d 52, 61 (1st Cir. 2004). This Court, however, is required to make the requisite findings:

> [B]efore a court imposes the enhancement based on a finding of perjury, it must determine whether the defendant, "testifying under oath ⋯ [, gave] false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan,* 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993).

Fox, 393 F.3d at 61.

In this case, such a finding is compelled by the trial evidence and by the jury's verdict. Morales testified that she did not take money from any of the witnesses who testified and that she was unaware of any money being paid to anyone in relation to her issuance of rent subsidy vouchers. The jury found, beyond a reasonable doubt, that Morales in fact committed the charged offenses. That finding effectively establishes the falsity of Morales's testimony. It

remains only for the Court to determine that Morales's falsehoods were not the result of "confusion, mistake or faulty memory."

The willfulness of Morales's falsehoods is evident in the very subject matter of her lies, coupled with the fact that they were part of a tissue of fabrications that bordered on the fantastical. Morales insisted that she prepared literally dozens of phony files, all on her last day in the office, under the most dire imaginable duress. It is inescapable that Morales's lies were willful and intentional. See, e.g., United States v. Villarman-Oviedo, 325 F.3d 1, 16 (1st Cir. 2003) (approving obstruction of justice enhancement where defendant's version of events was irreconcilably opposed to the jury's guilty verdict and noting that "the jury must perforce have determined that Villarman's testimony was false – not the product of mistake, confusion or faulty memory, but rather stemming from Villarman's desire to convince the jury of a fabricated theory to excuse himself from liability."); United States v. Bradstreet, 135 F.3d 46, 57 (1st Cir. 1998) (noting, where defendant denied core factual allegations of the charge, the jury's guilty finding "conclusively establishes that Bradstreet testified dishonestly at trial" and noting that the defendant's "contrary testimony strikes us as inherently not subject to characterization as unintentional.").

The United States proposes that the Court make the following finding of fact in support of the application of the obstruction of justice enhancement under U.S.S.G. §3C1.1:

> Consistent with the jury's verdict, the Court finds that Marysol Morales's trial testimony, in which she denied receiving money in connection with rent subsidy applications was false. The Court further finds that Morales's testimony that she only falsified files on her very last day working at Avon Housing Authority and that she did so only as a result of direct intimidation and coercion by another individual is wholly unworthy of belief. The Court further finds that Morales false testimony was part of a wholesale fabrication, intentionally designed to excuse herself from liability. Morales's false testimony was material,

willful and intentional and was not the result of any confusion, mistake or faulty memory.

4.  "High-Level" Decision Making

U.S.S.G. §2C1.1(b)(3) provides for a 4 level enhancement "If the offense involved . . . any public official in a high-level decision making or sensitive position . . .." The guideline commentary elaborates as follows:

> Application of Subsection (b)(3).
>
> (A)  Definition.– "High-level decision-making or sensitive position" means a position characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision-making process.
>
> (B)  Examples. – Examples of a public official in a high-level decision-making position include a prosecuting attorney, a judge, an agency administrator, and any other public official with a similar level of authority. Examples of a public official who holds a sensitive position include a juror, a law enforcement officer, an election official, and any other similarly situated individual.

U.S.S.G. § 2C1.1, comment. n.4.

Defendant suggests that, because Morales was supposed to administer the Section 8 program in accordance with applicable law, regulations and procedures, she lacked decision-making authority. But the fact that a government official is supposed to obey rules in exercising her administrative discretion does not make her any less a decision maker. The D.C. Circuit in United States v. Gatling, 96 F.3d 1511, 1525-1526 (D.C. Cir. 1996), addressed a virtually identical objection and affirmed the application of the "high-level decision making" enhancement to a public housing authority Section 8 manager. The court's reasoning is fully applicable here:

> While regulations may have curtailed [the defendant's] ability to issue section 8 subsidies as she chose, she had the power to issue subsidies without the need for further authorization or review. Her position made her the top official within the Section 8 Division and lowered the possibility that the section 8 subsidies she had illegally issued would be uncovered.

96 F.3d at 1526.

The Gatling decision makes clear that the enhancement for high-level decision may properly be applied to a corrupt Section 8 manager. It must be noted, however, this case is somewhat more difficult than Gatling. While Morales's position as Section 8 Manager was one of considerable authority and responsibility, the Avon Housing Authority was quite small. It appears that the Section 8 program at issue in Gatling was substantially larger. The Gatling decision does not detail all the appurtenances of the Section 8 manager's authority in that case, it should be noted that Morales's did not have budget authority and did not have check-signing authority.

      III.     SENTENCING CONSIDERATIONS UNDER 18 U.S.C. § 3553.

The trial evidence established beyond a reasonable doubt that, on at least four occasions, Morales unlawful solicited and received payments in connection with her issuance of Rent Subsidy Vouchers. Likewise, the evidence established 15 instances in which Morales created patently false documents to cover-up her wholly unauthorized disbursement of Avon Housing Authority monies in the form of Rent Subsidies for which no funding or authorization existed. But this was just the proverbial "tip of the iceberg." As set forth in the PSR, there were 92 such instances in which Morales covered-up, for many months, such fraudulent payment arrangements. This is, of course, treated as "relevant conduct" for purposes of the guideline calculation. However, by virtue of the applicable grouping rules, Morales ultimate guideline

level is scarcely higher than it would be if the entire criminal episode had been limited to four discrete incidents of taking bribes.

To put it another way, the guideline sentencing range tends to significantly <u>under</u> count Morales true culpability. The victim impact statement submitted by Krisanne Sheedy, reflects some of the devastation that Morales caused which is not reflected <u>at all</u> in the guideline calculation. Among these are the following::

(1)     Most important is the wholesale dislocation of dozens and dozens of families, who settled into apartments in the belief that they had secured decent places to live, dwellings they could not have afforded without the subsidies. For these families, Christmas of 2004 was marked by the heartsickening news that they would lose their homes and the New Year saw their wholesale evacuation. The 92 vouchers that Morales issued translate, in human terms, into 92 families uprooted with an unknown number (presumably higher than 92) of children cruelly torn from their homes in the middle of the school year. It is, of course, a matter of speculation why so many of the families simply abandoned their apartments when notice arrived that their subsidies were being cut-off. Given the circumstances, it is reasonable to infer that some of these families had obtained their vouchers improperly (<u>i.e.</u> that they paid bribes to Morales), knew their subsidies would vanish, could not sustain the rent on their own and, having nothing to stay for, fled to avoid getting in trouble with the law. Others may have fled because they are illegal immigrants who fear any contact with law enforcement authorities. Whatever may be the reasons and circumstances, no speculation is required to find that the emotional and social impact of such a sudden uprooting was devastating to dozens of impoverished women and children.

The guidelines provide for substantial incremental punishment for offenses that "involved 50 or more victims." U.S.S.G. §2B1.1(b)(2)(B) (4-level increase), recognizing that crimes of such broad impact warrant substantially more severe punishment. But there is no such enhancement in the applicable guidelines here.

None of this harm, which was the inevitable result of Morales's criminal activities, is accounted for in the guidelines. Accordingly, absent an upward departure or a <u>Booker</u> deviation, the primary human impact of Morales's crimes remains unredressed.

(2)     Morales crime inflicted substantial financial losses upon the landlords who appropriately relied on their tenants' Section 8 Rent Subsidy Vouchers, issued by Morales for the Avon Housing Authority, in leasing their apartments. Many of these landlords were simply residents of multiple-family dwellings, dependent on the income from their rental units to meet their own mortgages. The harms that befell them were the entirely foreseeable result of Morales' decision to issue unauthorized vouchers, knowing that the landlords would rely on them.

These financial losses are not reflected in the guideline calculations.

Absent an upward departure or a <u>Booker</u> deviation, these direct and foreseeable financial harms remain unredressed.

(3)     Morales's crimes also destroyed entirely the Avon Housing Authority's Section 8 Rent Subsidy Voucher Program. That program had operated for years. Under the firm but gentle leadership of Margaret Josephine Holmes the Avon Housing Authority had served as a human-sized, compassionate and efficient engine for providing urgently needed services to some of Massachusetts's neediest citizens.

In a different context, the guidelines recognize that a fraud so pervasive as to destroy an entire institution warrants an enhanced sentence. See U.S.S.G. 2B1.1 (4 level enhancement if offense "substantially jeopardized the safety and soundness of a financial institution). But here there is nothing in the guideline calculation to reflect that Morales destroyed a worthy government agency that was dedicated to helping truly needy citizens.

Absent an upward departure or a <u>Booker</u> deviation, these direct and foreseeable financial harms remain unredressed.

(4)     Undermining Public Trust in the Housing Program.

Krisanne Sheedy's victim-impact statement also points out that Morales crimes have undermined public confidence, not only in the integrity the tenant-selection process, but the in the very validity of Section 8 housing vouchers. There are already plenty of factors that make it difficult for voucher recipients to find decent housing. Even though discrimination is illegal, there is pervasive prejudice against those who receive public assistance. To some degree, the Section 8 program offsets this prejudice by offering the certainty that, regardless of the <u>tenant</u>'s financial wherewithal, a landlord is assured of timely collecting the rent, thanks to the monthly subsidy checks. In the wake of Morales crimes, however, the owners of 92 rental units have now learned that you can get "burned" by relying on a facially valid voucher and leasing agreement. For those affected by Morales's crimes, and for those merely hearing of them, there is no longer any"full faith and credit" in the Section 8 voucher program. This is not just the disgust or

disappointment that comes with learning that a public official was "on the take,"[2] this is an undermining of public faith in the validity of facially legitimate Section 8 vouchers.

The commentary to U.S.S.G. §2C1.1 notes that such pervasive undermining of public trust in an government program or office may warrant an upward departure:

> In a case in which the court finds that the defendant's conduct was part of a systematic or pervasive corruption of a governmental function, process, or office that may cause loss of public confidence in government, an upward departure may be warranted. See § 5K2.7 (Disruption of Governmental Function).

U.S.S.G. §2C1.1, comment. n.7.

U.S.S.G. §5K2.7 notes that "Departure from the guidelines ordinarily would not be justified when the offense of conviction is an offense such as bribery or obstruction of justice." As the guidelines recognize, "in such cases interference with a governmental function is inherent in the offense, and unless the circumstances are unusual the guidelines will reflect the appropriate punishment for such interference." Here, however, the harm to the program is derives not from the four instances of proven bribery, but from the other offense charged, defendant's systematic falsification of Section 8 rent subsidy files. Unlike Morales's bribery/corruption offenses, which undermine public confidence in the integrity of the decision makers, her massive false document fraud undermines the credibility of the Section 8 voucher program itself. When 92 Section 8 housing vouchers turn out to be worthless, the impact on public acceptance of the program is immeasurable.

---

[2] Inherent in any bribery or corruption case is the corrosive impact associated with the revelation that officials who are supposed to be serving the public are in fact lining their own pockets and abusing the public trust. That loss of public trust is reflected in the guideline calculation.

Nothing in the guideline calculations reflects this undermining of public confidence in a government program and its concomitant indirect harm to our poorest citizens who rely on that program. Absent an upward departure or a <u>Booker</u> deviation, this harm is unredressed.

## CONCLUSION

Section 3553 directs the Court to impose a sentence sufficient, but not higher than necessary, to meet the manifold objectives of federal sentencing policy.

It is unlikely that Marysol Morales will ever be in a position to commit similar offenses. But the measure of a sufficient sentence, in this case, must focus not only on questions of individual deterrence, but upon redressing the harms that Morales's criminality has wrought, in the lives of vulnerable individuals and in the undermining of a government program designed to help those citizens.

The United States recommends a sentence at the high end of the guidelines as calculated in the PSR. In the event that the Court adopts a lower offense level, the United States recommends an upward departure to reach the same result.

                                        Respectfully submitted,

                                        MICHAEL J. SULLIVAN
                                        United States Attorney

dated: July 27, 2006

                                  By: <u>/s/ Paul G. Levenson</u>
                                        PAUL G. LEVENSON
                                        Assistant U.S. Attorney
                                        John Joseph Moakley United States Courthouse
                                        1 Courthouse Way, Suite 9200
                                        Boston, MA 02210
                                        (617) 748-3147

CERTIFICATE OF SERVICE

      I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non registered participants on this date.

dated:  July 27, 2006

                                   /s/ Paul G. Levenson
                                   PAUL G. LEVENSON